## GRAMA Request for Utah's Voter Rolls

| From | ████████████████████████████ |
|------|------|
| To | Collin Tanner<collintanner@utah.gov> |
| Date | Sunday, September 22nd, 2024 at 4:30 PM |

Phil Lyman

████████████████████████████

███████

█████████████

████████████

Dear Lieutenant Governor Henderson,

Pursuant to the National Voter Registration Act, I am writing to request a copy of the statewide voter registration database, including data for voters classified as "Private" and "Withheld."

Section 8 of the National Voter Registration Act (NVRA) prescribes requirements with respect to state administration of voter registration for federal elections.

52 U.S.C. § 205073. Section 8(i)(1), titled "Public disclosure of voter registration activities," provides:

Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1)(emphasis added).

The statute only contains the following two exceptions to its requirement that your office produce "all records": (1) records relating to the declination to register to vote, or

(2) records about the identity of the voter registration agency through which any particular voter was registered.

In Pub. Int. Legal Found. v. Griswold, 2023 U.S. Dist.

LEXIS 176231, *17 (USDC D. Colo. Sept. 29, 2023) (emphasis added), the court found that "information covered by the disclosure provision of the NVRA, but protected by other federal statutes, should be read as exceptions to the NVRA's disclosure provision instead of as constraints on how the disclosure provision should be interpreted." In that instance, the court held the Secretary of State of Colorado could comply with the Driver's Privacy Protection Act, 18 U.S.C. § 2721, by redacting uniquely sensitive information in otherwise disclosable documents. Id. at *19.

The NVRA preempts state laws that prevent the disclosure of data that must be disclosed under the

NVRA. Section 8(1) of the NVRA provides for the disclosure of voter registrations in order to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." Project Vote/Voting for Am., Inc. V. Long, 682 F.3d 331, 339 (4th Cir. 2012). In Public In. Legal Found. V. Knapp, Case No. 3:24-cv-1267 (USDC Dist. S. Carolina, Sept. 18, 2024) 1 at 14-15, the court found that the NVRA preempts a South Carolina law that "conflicts with the NVRA's mandate that all records concerning maintenance and accuracy activities be made available for 'public inspection." Because adherence to South Carolina law would frustrate application of the Federal mandate, the state law must yield. Project Vote/Voting For Am., Inc. V. Long,

813 F. Supp. 2d 738, 743 (E.D. Va. 2011), aff'd and remanded, 682 F.3d 331 (4th Cir. 2012) ("Furthermore, to the extent that any Virginia law, rule, or regulation forecloses disclosure of completed voter registration applications with the voters' SSNs redacted, the court FINDS that it is preempted by the NVRA."). Similarly, Utah's laws preventing the disclosure of voter data classified as "Private" or "Witheld" are preempted by the NVRA.

The NVRA provides for a private right of action under 52

USC 20510(b). If your office does not comply, we have a right to file an action in federal court to seek enforcement after providing you a Notice of Violation and giving you 90 days to comply with the NVRA.

Please produce a full copy of statewide voter registration database, including the data of voters classified as

Exhibit A, page 1 of 2

"Private" or "Withheld" under state law. If you are going to redact any information from the list, please provide a justification for the redactions and an explanation of how the redactions comply with the NVRA. 21

[1] A copy of the decision is attached to this request as Exhibit A.

2] We note that we will consent to the redaction of certain PII like social security numbers, driver's license numbers, etc. We ask that your office disclose what data elements will be redacted so we can ensure compliance with the NVRA.

Sent with ███████████ .

Exhibit A, page 2 of 2



# Re: Fw: Voter Rolls Appeal

| From | babailey@utah.gov <babailey@utah.gov> |
|---|---|
| To | ███████████████████████████ |
| CC | Collin Tanner<collintanner@utah.gov> |
| Date | Monday, November 4th, 2024 at 2:13 PM |

Hello Mr. Lyman,

I hope this email finds you well. I write in response to your appeal dated 10/15/2024.

As has been noted in previous emails, the Office of the Lieutenant Governor is happy to process a request for Utah's voter rolls as outlined in statute. You may access voter rolls, and obtain a copy of those rolls, by submitting a request here. The extent of voter information available to you (and all other candidates) is governed by Utah Election Code, 20A- chapter 2, and is enumerated on the submission page of the request form.

The Lieutenant Governor's Office does not have discretion to ignore state statute and provide unrestricted access to the state's voter rolls as you have requested.

Best,
Brody

On Tue, Oct 15, 2024 at 8:44 AM Phil Lyman <██████████████████> wrote:

> Sent with ████████████████.
>
>     Forwarded Message
> From: Phil Lyman <████████████████>
> Date: On Thursday, October 10th, 2024 at 3:35 PM
> Subject: Voter Rolls Appeal
> To: Collin Tanner <collintanner@utah.gov>
>
>> Dear Lieutenant Governor Henderson,
>>
>> I am writing to appeal my GRAMA request to the Chief Administrative Officer under Section G-401 of the Record Management Policy (RMP) of the Office of the Lieutenant Governor of Utah (May 3, 2023). *See*

Exhibit B, page 1 of 6

file:///C:/Users/goudp/Downloads/GRAMA%20Policy%20-%20Lt.%20Governor's%20Office.pdf.

On September 22, 2024, I filed a GRAMA request with your office for a copy of the statewide voter registration database under the National Voter Registration Act. A copy of my GRAMA request is provided with this appeal. **Under Section 8 of the National Voter Registration Act, you are not allowed to withhold information for voters classified as "Private" or "Withheld."**

Your office was required to respond to my GRAMA request within 10 business days (by Monday, October 7th). *See* Utah Code Ann. § 63G-2-204(9). To date, I have not received any response from your office. Your office's failure to respond within ten business days "is considered the equivalent of a determination denying access to the record." *Id.* I am exercising my right to appeal this determination to the Chief Administrative Officer (CAO) under Utah Code Ann. § 63G-2-401(1)(a)(i)(B). Under your RMP, an appeal to the CAO has to be submitted "no later than 15 days after the date that the "records officer is considered to have not responded to the request under Subsection G-204 [which states that your office will follow the process outlined in Section 63G-2-204)." Thus, my appeal is timely.

As discussed in more detail below, I request a copy of the full voter registration rolls, including voters classified as "Private" or "Withheld" under Section 8 of the National Voter Registration Act. Your office must produce the full voter rolls, including the information of voters classified "Private" and "Withheld" under Section 8 of the National Voter Registration Act. You are now required to respond to my appeal within 20 business days under G-402(2)(a)(i).

## *GRAMA Request*

Pursuant to the National Voter Registration Act, I am writing to request Section 8 of the National Voter Registration Act (NVRA) prescribes requirements with respect to state administration of voter registration for federal elections. 52 U.S.C. § 205073. Section 8(i)(1), titled "Public disclosure of voter registration activities," provides:

> Each State shall maintain for at least 2 years and *shall make available for public inspection* and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

Exhibit B, page 3 of 6

52 U.S.C. § 20507(i)(1)(emphasis added).

The statute only contains the following two exceptions to its requirement that your office produce "all records": (1) records relating to the declination to register to vote, or (2) records about the identity of the voter registration agency through which any particular voter was registered.

In *Pub. Int. Legal Found. v. Griswold*, 2023 U.S. Dist. LEXIS 176231, *17 (USDC D. Colo. Sept. 29, 2023) (emphasis added), the court found that "information covered by the disclosure provision of the NVRA, but protected by other *federal* statutes, should be read as exceptions to the NVRA's disclosure provision instead of as constraints on how the disclosure provision should be interpreted." In that instance, the court held the Secretary of State of Colorado could comply with the Driver's Privacy Protection Act, 18 U.S.C. § 2721, by redacting uniquely sensitive information in otherwise disclosable documents. *Id.* at *19.

**The NVRA preempts state laws that prevent the disclosure of data that must be disclosed under the NVRA.** Section 8(i) of the NVRA provides for the disclosure of voter registrations in order to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). In *Public In. Legal Found. V. Knapp*, Case No. 3:24-cv-1267

(USDC Dist. S. Carolina, Sept. 18, 2024) at 14-15, the court found that the NVRA preempts a South Carolina law that "conflicts with the NVRA's mandate that all records concerning maintenance and accuracy activities be made available for 'public inspection.'' Because adherence to South Carolina law would frustrate application of the Federal mandate, the state law must yield. *Project Vote/Voting For Am., Inc. v. Long*, 813 F. Supp. 2d 738, 743 (E.D. Va. 2011), aff'd and remanded, 682 F.3d 331 (4th Cir. 2012) ("Furthermore, to the extent that any Virginia law, rule, or regulation forecloses disclosure of completed voter registration applications with the voters' SSNs redacted, the court FINDS that it is preempted by the NVRA."). Similarly, Utah's laws preventing the disclosure of voter data classified as "Private" or "Withheld" are preempted by the NVRA.

The NVRA provides for a private right of action under 52 USC 20510(b). If your office does not comply, we have a right to file an action in federal court to seek enforcement after providing you a Notice of Violation and giving you 90 days to comply with the NVRA.

Please produce a full copy of the statewide voter registration database, including the data of voters classified as "Private" or "Withheld" under state law. If you are going to redact any information from the list, please identify the data elements that have been redacted, provide a legal justification for each data

element that has been redacted and an explanation of how the
redactions comply with the NVRA.

Representative Phil Lyman

Sent with ███████████

--



**BRODY BAILEY** | **ELECTION COORDINATOR**
OFFICE OF LIEUTENANT GOVERNOR
DEIDRE M. HENDERSON
LTGOVERNOR.UTAH.GOV | 801-538-1055



**PUBLIC INTEREST LEGAL FOUNDATION**

March 7, 2025

*VIA EMAIL*
Lieutenant Governor Deidre M. Henderson
Utah State Capitol
350 North State Street
Suite 220
Salt Lake City, UT 84114
Email: elections@utah.gov

**RE: Notice of National Voter Registration Act Violation**

Lt. Governor Henderson:

I write on behalf of Mr. Phil Lyman, a Utah resident and registered voter, who sought, and was denied, records that federal law requires to be made publicly available, namely the full list of registered voters.

Pursuant to 52 U.S.C. § 20510(b)(1), this letter serves as statutory notice that Utah is in violation of the National Voter Registration Act (NVRA) for failure to permit inspection and reproduction of public records as required by the NVRA, 52 U.S.C. § 20507(i)(1).

The Utah Lieutenant Governor is Utah's chief election official, Utah Code Annotated § 20A-1-105(1)(a), and is "responsible for coordination of State responsibilities under" the NVRA, 52 U.S.C. § 20509. **The Utah Lieutenant Governor is hereby notified that she is violating the NVRA and litigation may commence against her if the violations described herein are not cured within 90 days of the receipt of this letter.** *See* **52 U.S.C. § 20510(b)(2).**

**Background**

Thirty years ago, Congress decided that decisions about who is and is not eligible to vote should be transparent and publicly accessible, so that voting rights are not lost to errors and inefficiencies, or worse, discrimination. According to the Fourth Circuit Court of Appeals, "[i]t is selfevident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls…Without such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331, 339

107 S. West Street, Suite 700, Alexandria, Virginia 22314
Telephone: 703.745.5870   Fax: 888.815.5641   PublicInterestLegal.org

Exhibit C, Page 1 of 6

(4th Cir. 2012). The NVRA's Public Disclosure Provision mandates public disclosure and reproduction of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). This provision "plays an important role in ensuring that States are performing their mandated duties as federal law directs, as it provides the public with a means to obtain records by which accuracy and compliance with those duties can be assessed." *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1223 (D.N.M. 2024). The records the NVRA describes are commonly referred to as "voter list maintenance" records.

Every court to address the question has held that a state's voter roll, or a portion thereof, is subject to disclosure under the NVRA, including, just last year, the First Circuit Court of Appeals. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 47 (1st Cir. 2024) (explaining that the "Voter File plainly relates to the carrying out of Maine's voter list registration and maintenance activities and is thereby subject to disclosure under Section 8(i)(1)."). *See also Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022) (concluding that, "the phrase 'all records,' as used in the Public Disclosure Provision, necessarily includes the statewide voter registration list"); *Pub. Int. Legal Found., Inc. v. Knapp*, No. 3:24-cv-1276-JFA, 2024 U.S. Dist. LEXIS 209495, at *18 (D.S.C. Sep. 18, 2024) ("[T]he Court declares that the South Carolina Statewide Voter Registration List is a record subject to inspection pursuant to the NVRA, and that the NVRA preempts any South Carolina law limiting access to the Statewide Voter Registration List to South Carolina registered voters.").

Utah's statewide voter registration list is likewise within the NVRA's scope and subject to disclosure and reproduction, yet Utah is not allowing public access to these records on the NVRA's terms.

**State Law Concerning Utah's List of Registered Voters**

First, Utah law prohibits the disclosure of the day and month of a voter's date of birth to any individual but allows a "qualified person" to obtain a voter's year of birth. Utah Code Annotated § 20A-2-104(4)(b). State law defines "qualified person," as including political parties and candidates, among others. Utah Code Annotated § 20A-2-104(4)(a).

Second, Utah law separates the list of registered voters into three categories: public, private, and withheld. Notably, any voter can request that their voter registration information be classified as "private." *See* Utah Code Annotated § 20A-2-104(4)(h). Only someone who is a "qualified person" may access this portion of the list. *See* Utah Code Annotated § 20A-2-108(2)(b).

2

Third, certain individuals can request to have their voter records be classified as "withheld." Those individuals include:

- a victim or likely victim of domestic or dating abuse and anyone they live with;
- a law enforcement officer;
- a member of the armed forces;
- a public figure;
- an individual protected by a protective order.

See Utah Code Annotated § 20A-2-104(1)(e)(i) and (ii). "Withheld" records can only be provided to a government official. Notably, every voter who was classified as "private" before May 12, 2020, was re-classified as "withheld" by the Utah Legislature. Utah Code Annotated § 20A-2-104(1)(e)(iii). This means there are voters who were classified as "Withheld," who are not victims of domestic or dating abuse, law enforcement officers or in one of the other categories listed in § 20A-2-104(1)(e)(i) and (ii).

It is not presently possible to know how many records are classified as "private" and how many records are classified as "withheld." In 2020, in response to a request for the voter registration rolls in Salt Lake County, the Salt Lake County Clerk withheld 37% of the voter rolls because the records were classified as "Private" or "Withheld" under Utah's Election Code. *See* Report of the Salt Lake County Republican Party's Election Integrity Committee at 10-12.

**NVRA Request**

Mr. Lyman seeks voter list maintenance documents to assess if Utah's voter roll is current and accurate in accordance with federal and state law. Mr. Lyman may use his findings to propose and promote best practices and solutions for specific and general voter list maintenance problems faced by election officials.

On September 22, 2024, pursuant to the NVRA, Mr. Lyman requested from your office certain voter list maintenance records, namely: "a copy of the statewide voter registration database, including data for voters classified as 'Private' and 'Withheld.'" In the request, Mr. Lyman explained the NVRA's requirements. Mr. Lyman also stated that he would "consent to the redaction of certain PII like social security numbers, driver's license numbers, etc." Your office did not respond to Mr. Lyman's September 22, 2024, NVRA request.

Although not required under the NVRA, Mr. Lyman sought to exhaust all administrative remedies available under state law in hopes of obtaining the requested records. On October 15, 2024, Mr. Lyman wrote to the Chief Administrative Officer (CAO) of your office, again seeking access to documents pursuant to the NVRA.

3

**Violation of the National Voter Registration Act**

On November 4, 2024, Mr. Brody Bailey from your office responded, directing Mr. Lyman to the website for access to the public version of the statewide voter roll. Regarding Mr. Lyman's request for the complete voter roll, Mr. Bailey stated that "[t]he Lieutenant Governor's Office does not have discretion to ignore state statute and provide unrestricted access to the state's voter rolls as you have requested." Mr. Lyman was not provided the requested records.

Any state law limiting disclosure of the requested records, such as Utah Election Code, 20A- chapter 2, is inapplicable to Mr. Lyman's request because the NVRA, as a federal enactment, is superior to conflicting state laws under the Constitution's Elections and Supremacy Clauses. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12-15, 133 S. Ct. 2247, 2255-57 (2013). Courts that have considered these issues have found that a state's list of registered voters is subject to disclosure under the NVRA and that state law is preempted by the NVRA, to the extent of the conflict between the laws. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th at 54; *Pub. Int. Legal Found., Inc. v. Knapp*, No. 3:24-cv-1276-JFA, 2024 U.S. Dist. LEXIS 209495, at *18 (D.S.C. Sep. 18, 2024); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022); *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 438-442, 445 (D. Md. 2019) ("State law is preempted in so far as it allows only Maryland registered voters to access voter registration lists.").

Utah's restrictions on what information the public can access conflicts with Section 8 of the NVRA because they restrict what the NVRA requires—public inspection and reproduction of "all" voter list maintenance records. 52 U.S.C. § 20507(i)(1).

Further, by allowing *some* disclosure only to a "qualified person," such as a political party or candidate, but not to other individuals such as Mr. Lyman, Utah's restrictions also unlawfully discriminate in violation of the equal protection clause of the Fourteenth Amendment and burden Mr. Lyman's ability to exercise his First Amendment rights.[1]

---

[1] *See, e.g., Providence Journal Co. v. Farmer*, No. 85-0602B, 1986 U.S. Dist. LEXIS 31325, at *9, *11 (D.R.I. July 25, 1986) ("Rhode Island General Law section 17-6-5 abridges the right of access to public records by excluding the public from total access to the magnetic tape of the central voter registry. … [T]he statute is a denial of First and Fourteenth Amendment protections and unconstitutional."); *Donrey Media Grp. v. Ikeda*, 959 F. Supp. 1280, 1287 (D. Haw. 1996) ("The statute, as drafted, provides dangerous precedent by allowing the state government and local municipalities to control the type of access to voter registration records that will be permitted to the press while permitting record access to political parties and certain

4

Congress enacted the NVRA, in part, "to protect the integrity of the electoral
process" and "to ensure that accurate and current voter registration rolls are
maintained." 52 U.S.C. 20501(b)(3)-(4). To reach those goals, the NVRA requires
each state to make "all" voter list maintenance records available for public
inspection. 52 U.S.C. § 20507(i)(1). This provision "convey[s] Congress's intention
that the public should be monitoring the state of the voter rolls and the adequacy of
election officials' list maintenance programs." *Bellitto v. Snipes*, No. 16-cv-61474,
2018 U.S. Dist. LEXIS 103617, at *12-13 (S.D. Fla. Mar. 30, 2018).

By withholding a presently untold number of records, Mr. Lyman has been unable
to do precisely what Congress intended: "monitor[] the state of the voter rolls and
the adequacy of election officials' list maintenance programs." *Id*. In short, Utah law
prevents what federal law requires.

**Conclusion**

As the State's chief election official, you are responsible for ensuring that Utah
complies with the NVRA. Your denial of Mr. Lyman's request violates the NVRA.
The NVRA authorizes private lawsuits to enforce its provisions. 52 U.S.C. §
20510(b)(2). Failure to permit public inspection or otherwise provide copies of the
requested records is a violation of federal law for which the NVRA provides a
private right of action. 52 U.S.C. § 20510(b). For lawsuits initiated by a private
party, an award of attorney's fees, expenses, and costs incurred is available under
52 U.S.C. § 20510(c). Counsel for Mr. Lyman has been awarded attorney's fees and
litigation expenses as the prevailing party in actions to enforce the NVRA's public
inspection rights.[2]

---

other organizations. This clearly is an intolerable infringement upon the public's
right to know and denies a means of public access to important information relative
to the integrity and honesty of the elections process."); *Libertarian Party of Ind. v.
Marion Cty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1465 (S.D. Ind. 1991) ("In
light of the court's ruling that IC 3-7-7-10, as applied by the Voter Registration
Board to the plaintiffs in this case, violates the plaintiffs' equal protection rights,
the county Defendants are hereby ordered to provide copies of Registration Lists to
the plaintiff New Alliance and Libertarian parties in the same forms and manners
and on the same terms as such lists are distributed to major political parties[.]").

[2] *See* Doc 109, *Public Interest Legal Foundation v*. Bellows, No. 1:20-cv-00061
(entered Aug. 16, 2024); Doc. 97, *Public Interest Legal Foundation v. Bennett*, No.
4:18-cv-0981 (entered June 30, 2021).

Exhibit C, Page 5 of 6

If the violation described herein is not cured in the time afforded by law, we will have no choice but to pursue remedies in federal court. Please contact me to arrange for secure transmission of the requested records, if necessary.

Thank you for your continued attention to this matter.


Sincerely,

Logan Churchwell
Research Director
Public Interest Legal Foundation


cc:    Ryan Cowley, Director of Elections
       Shelly Jackson, Deputy Director of Elections
       Collin Tanner, Elections Coordinator
       Brody Bailey, Legal and Process Analyst
       Joe Pyrah, Chief of Staff

6

# Report of the Salt Lake County Republican Party's Election Integrity Committee

## Introduction

In May of 2021, the Salt Lake County GOP formed an Election Integrity Committee to evaluate Salt Lake County's voting system to determine what, if any, improvements can be made. The Committee is an all-volunteer committee with a variety of backgrounds (legal, engineering, information technology, statistics, banking/finance, and retail management). Our observations and suggestions are based on the data we were able to collect through employee interviews, site visits, tours of voting facilities, GRAMA requests, attending logic and accuracy tests, and more. This final version of the Report has been voted on and approved by the Committee, and is available to the public.

Over the years, the major political parties have questioned certain election results, leading to allegations and suspicion of faulty election systems and practices. Whether it is the 2000 election between Bush and Gore, the 2016 election between Clinton and Trump, the 2020 election between Biden and Trump, or others, voters and candidates have been left disenfranchised, with many unanswered questions.

The Committee believes that informed voters, participating in a transparent election process, will have greater confidence in election results. If and when questions arise regarding the outcome of certain races, the participating voter is there to support the election system, its processes, and thereby, the outcome.

The Committee hopes voters and lawmakers will find the following information helpful in their voting actions, thoughtful discussions, and potential policy changes regarding safe elections in Salt Lake County and across Utah.

Information in this Report was utilized by Legislators during the 2022 Legislative Session as they engaged in determining better election policy and statute.

Please enjoy the Report.

**Table of Contents**

1. Ballot Drop Boxes - Chain of Custody

2. Mail-In Voting - Identification

3. Voter Records - Non-Public

4. Vote Counting and Processing

5. Ballot Deadline

6. Ballots Without a Postmark

7. Ballot Adjudication

8. Electronic Log of Duplicated Ballots

9. Ballot Harvesting

10. Repeal Utah Code Annotated § 20A-1-308 (Elections During Declared Emergencies)

11. Access to Election-Related Documents

12. Prohibit Private Funding of Elections

13. Post-Election Evaluations

14. Ballot Images

15. Forensic Images

16. Black Boxes

**Findings and Recommendations**

### 1. *Ballot Drop Boxes - Chain of Custody*

**Background**: In the 2020 General Election, 286,304 ballots were placed into 22 ballot drop boxes in Salt Lake County.[1] That represents 57% of the total number of mail ballots (498,471) turned in for that election.[2] Individuals can drop ballots into ballot drop boxes 24 hours a day from the time they are open until 8:00 p.m. on Election Night.[3] Although they are open 24 hours a day, the Clerk's office does not have any surveillance videos of the drop boxes.[4] Under these circumstances, it is possible that ballot drop boxes can be used for ballot harvesting.

The Salt Lake County Clerk's Office does not keep "records that show the times that boxes were emptied, which personnel emptied them, or the amount of time that ballots were in transit."[5] In response to a GRAMA request, the Clerk's office produced its policy for picking up ballots from ballot drop boxes.[6] The Clerk's office currently:

- Sends out teams of two to empty the contents of ballot drop boxes.[7]
- The team empties the box into a plastic bin or bag and seals it with two wire ties.[8]
- They take the ballots back to the Salt Lake County Ballot Center where they are met by a receiving team that verifies the identity of the ballot drop box into which the ballots were deposited. [9]

At this point, the Clerk's office weighs the ballots on a scale that has been calibrated to provide the number of ballots based on weight, and records the following information in a spreadsheet: the ballot drop box, the date, and the number of ballots retrieved from that box on that day.[10] During a tour of ballot processing during the 2021 Primary Election, the Clerk's office said they have modified their chain of custody procedures for ballot drop boxes from the 2020 General Election. This report does not address changes to the chain of custody procedures for ballot drop boxes that the Clerk has implemented since the 2020 General Election. The committee

---

[1] Exhibit A at 4.

[2] https://results.enr.clarityelections.com/UT/Salt_Lake/107137/Web02.264677/#/?undefined.

[3] Exhibit B (PDF of Clerk's Office webpage showing hours for ballot drop boxes).

[4] Exhibit C at 1 (The committee filed a GRAMA request asking if "surveillance [was] used to observe drop boxes in the 2020 general election." In response, the Clerk's office stated that "[t]here are no surveillance videos of drop boxes.").

[5] Exhibit A at 1.

[6] *Id*. at 5.

[7] *Id*. Starting in 2021, the Salt Lake County Clerk began using the Unified Police Department of Greater Salt Lake (UPD) to collect ballots from ballot drop boxes. The Committee participated in poll watching the 2021 General Election. There were no indications that any other improvements were made to the chain of custody procedures for ballot drop boxes. In other words, the use of UPD officers to collect ballots from ballot drop boxes does not resolve the Salt Lake County Clerk's failure to track chain of custody for ballot drop boxes. Thus, the suggestions made in this report to improve the chain of custody for ballots retrieved from ballot drop boxes still apply.

[8] *Id*.

[9] *Id*.

[10] Exhibit A at 4.

notes that the improvements mentioned by the Clerk during the tour of ballot processing did not include 24-hour surveillance or the chain of custody process described below.

***The following suggestions can be implemented by clerks offices now. The committee also has the following suggested reforms for the state legislature to ensure uniformity across Utah:***

- ***Require 24 hour surveillance of ballot drop boxes.***

Ballot chain of custody should begin when a ballot is placed in a drop box. The failure to have video surveillance on ballot drop boxes means that these, when combined with an inability to accurately verify the identity of the voter as discussed below, can be used as a tool for ballot harvesting and ballot stuffing, both of which are illegal in Utah.[11] We recommend that the state legislature require that all ballot drop boxes be placed under 24-hour video surveillance and that the surveillance videos are available to be produced in response to GRAMA requests at no cost. The video also should be stored on a server for at least 48 months.[12]

- ***Require Chain of Custody for ballot drop boxes.***

The failure to track chain of custody for ballots retrieved from ballot boxes means that the results from ballot drop boxes can be manipulated in various ways. For example, a team could dispose of or damage ballots (which could make it so the ballots have to be cured or require adjudication) from a precinct they know is unfavorable to their preferred candidate. Due to the failure to track how long ballots are in transit, a more sophisticated malactor could unseal envelopes and replace the ballots inside with ballots more favorable for their preferred candidates.[13]

We recommend that the state legislature require that clerks offices track chain of custody from the time that an election worker opens a ballot drop box to collect the ballots inside to when they drop the ballots collected from ballot drop boxes at their respective ballot centers. At this time, Utah County has a better process for tracking ballot drop box chain of custody than any other large population county in Utah.[14] Each ballot drop box has a unique QR code. Like Salt Lake County, Utah County sends out teams of 2 to retrieve ballots from drop boxes. The teams have an app that they use to scan the QR code placed on each ballot drop box before the drop box is opened. They remove the ballots and seal them in a bag similar to the bags used by Salt Lake County. A tag is placed on the bag identifying which ballot box the ballots in the bag are from.

---

[11] *See* Utah Code Annotated § 20A-3a-501(5)(a).

[12] The committee is suggesting a longer retention period than federal law requires to make sure the data is kept until the next election cycle. For example, in 2022, the Salt Lake County Clerk is up for reelection. Increasing retention periods to be longer than the terms of Utah's county clerks will increase accountability by allowing a county clerk's successor to audit the elections that he or she has administered.

[13] Ballots do not have any personal data on them that link back to the voter to ensure the anonymity of an individual's vote. Hence, a sophisticated actor could potentially carefully unseal envelopes and replace the ballots inside with new ones.

[14] The information about the chain of custody system that Utah County uses is from an interview with the Utah County Clerk's Elections Director.

They weigh the bag of ballots on a fish scale that they keep in the vehicle used to pick up and transport ballots and enter the weight into the application. When they take the ballots back to the voting center, the staff looks at the bag tag to identify which drop box the bag is from, confirms the weight on a digital scale, and records the weight in the application. According to the Elections Director in Utah County, the variance in weights recorded by the digital scale and the fish scale results in a difference of 1-2 ballots. The Utah County Clerk's office can see this data in a dashboard. The state legislature should require that this data be put into a spreadsheet that can be made available to the public.

***The committee has the following suggestions for reforms for the political parties:***

- Set up a poll watching program and make sure that there are enough volunteers so that poll watchers are present anytime the Clerk's office has their hands on ballots, including when the Clerk's office sends out volunteers or UPD officers to collect ballots from drop boxes.[15]

***Recommendations to voters:***

- If Salt Lake County does not improve ballot drop box chain of custody, voters can protect themselves from the issues described above by voting in person, dropping off their mail ballots to an in-person voting location, and/or participating in poll watching that includes watching when the Clerk's office collects ballots from drop boxes and transports them to the Ballot Center.

- The suggested improvements can be implemented by the Salt Lake County Clerk without any authorization from the state legislature. Voters can choose candidates who will help implement these proposals.

2. ***Mail-In Voting - Identification***

***Background:*** Ballots are automatically mailed to every active registered voter in Utah.[16]  The voter fills in the ballot, folds the ballot, covers it with a security sleeve, and places the ballot in a return envelope provided by the clerk. The voter signs the outside of the envelope, seals the envelope, and places the completed ballot in a U.S. Postal Mailbox or an official drop box.[17] In Salt Lake County, the voter's signature is covered by a tab that is removed by the Clerk's office prior to the sealed envelope being placed into an Agilis machine

---

[15] During the tour of the Salt Lake County Clerk's ballot processing activities in August 2021, Ms. Swenson indicated that, if observers want to watch as ballots are collected from ballot drop boxes, she is going to get police escorts for the teams that she sends to collect ballots from ballot drop boxes. She ended up using UPD, rather than poll workers, to pick up the ballots. The use of UPD does not resolve the problems with the Clerk's failure to track chain of custody for ballot drop boxes, although, depending on the officers involved, it may improve the security of transporting ballots from the ballot drop boxes to the Salt Lake County Ballot Center.

[16] Utah Code Annotated § 20A-3a-202(2)(a).

[17] See Utah Code Annotated § 20A-3a-204 (1)(e)(iv) (discussing how mail ballots can be returned); Exhibit C at 18-19 (this is a scan of the return envelope that is enclosed with the ballot).

(https://www.youtube.com/watch?v=t-yqTfEJU94) for signature verification as discussed in more detail below.[18]

Currently, for all mail ballots (regardless of how voters submit them), Salt Lake County validates a voter's identity through verifying the signature on the envelope used to mail the ballot in. First, the Clerk's office tries to verify the signature using an Agilis signature verification machine made by Runbeck Election Services.[19] The signature is compared to the voter's signature on their voter registration form or, if the voter registered at the DMV, driver's license.  Signatures that are rejected by the Agilis machine are checked manually. According to the Clerk's office, the settings on the machine are so high that about 52% of mail votes submitted during the 2020 General Election required manual signature verification.[20] In the 2020 General Election, there were 498,471 paper votes that required signature verification. Based on the Clerk's statement, more than 259,000 paper voters required manual signature verification in the 2020 General Election.

The first pass at manual signature verification is done by temporary employees on a computer screen.[21] They compare a digital image of the signature on the envelope used to submit the ballot to the signature on the voter's voter registration form. The temporary employees are provided training about how to do signature matches. The Clerk's office provided a copy of the PowerPoint used for this training.[22] The training shows that signature verification is fairly complicated. Following are excerpts from the training:

- "No two writers can produce the same writing, and no one writer can perfectly reproduce the same writing twice."[23]

- It lists the following causes for inconsistent signatures: (1) natural shifts and changes over time; (2) physical reasons (*e.g.*, surgery); (3) maturing (18 years old versus 40 years old); (4) deterioration with age; (5) professional versus personal signature; (6) writing surface; (7) writing instrument; (8) intentionally altering.[24]

- It expects those verifying signatures to first try to verify the signature considering broad characterics of the signature like how quickly the document was signed; the size of the font; the slant and slope of the signature; the pressure used to sign; the type of writing (printed, cursive, or both); overall spacing between the names; the proportion of the signature to the box; the position of the signature; and the spelling of the names.[25]

---

[18] *E.g.*, Exhibit C at p. 18.

[19] *See* https://runbeck.net/.

[20] The data about the percentage of ballots that are rejected by the Agilis machines is from a discussion during a tour of the Clerk's ballot processing facilities during the processing of ballots turned in for the August 2021 primary.

[21] The information about the process for manual signature verification is from discussions the Committee had with employees of the Clerk's office during a tour of the Clerk's facilities in August 2021.

[22] Exhibit D.

[23] *Id*. at 5.

[24] *Id*. at 24.

[25] *Id*. at 13-18.

- If a signature cannot be verified using broad characteristics, it instructs individuals to consider local characteristics like internal spacing; size and proportion of letters/combo of letters; curves, loops, and cross points; beginning and end strokes; internal spacing of letters and combos of letters; curves, loops, and crosspoints of the letters; and beginning and ending stroke.[26]

It is unlikely that any individual can conduct accurate signature verification for any extended period of time due to the concentration required. If the temporary employee is unable to verify a voter's signature, he or she will pass it to a permanent employee who has access to more documents in the Salt Lake County Clerk's database for signature verification.[27] If the permanent employee is unable to verify the signature, the ballot is put on a cure list.[28] The Clerk's office tries to contact people on the cure list, and also provides a copy of it to candidates running for office in Salt Lake County every 24 hours.[29]

Signature verification is prone to errors and gives significant discretion to the Clerk's office about whether to accept the signatures of any mail ballots that have to be manually evaluated. To that point, signatures are not used to confirm a person's identity in any other areas of life where security and fraud are heightened concerns (banking, TSA checkpoints, DMV, etc.). The state government only accepts signature verification as a form of ID for voting. A compounding factor is it seems the Clerk's office could be biased in favor of verifying as many signatures as possible because they have a huge number of mail ballots they have to verify in a short period of time and it is faster to verify a signature rather than put it on a cure list.

An additional concern with signature verification is that voters who vote in person and by mail-in ballot are treated differently. Voters who vote in person are required to show a picture ID.[30] In comparison, those who vote by mail or ballot drop box are not required to show a picture ID.[31] This raises equal protection concerns because voters in Utah are being treated differently depending on how they vote. [32]

***The committee has the following suggestions for reforms:***

The committee considered multiple options for how to objectively verify the identity of a voter who casts a mail-in ballot. The reality is that it is impossible to definitively verify the identity of a voter who casts a mail-in ballot under the current system.

---

[26] *Id*. at 19-23

[27] The information about the process for manual signature verification is from discussions the Committee had with employees of the Clerk's office during a tour of the Clerk's facilities in August 2021.

[28] *Id*.

[29] The Committee has heard from at least one GOP candidate that the Clerk did not automatically provide her campaign with a copy of the cure list when she ran for office. Rather, the Clerk only provided the cure list upon request.

[30] Utah Code Annotated § 20A-3a-203(2)(b) (requires voters to present valid photo ID to vote in person); Utah Code Annotated § 20A-1-102(76) (defines what is an acceptable form of voter ID in Utah).

[31] Exhibit D at 4 (signature "[r]eplaces ID presented during in-person voting").

[32] *See* Exhibit E (article discussing Arizona initiative requiring similar types of IDs for in-person and mail ballots).

The committee has two suggestions about how to improve the ability to verify the identity of voters who cast mail-in ballots.

- ***Starting in 2022, require an objective form of ID with a mail in ballot.***

The state legislature should require that ballots dropped into the mail or a drop box require both a signature on the envelope (the current practice) and the number for a photo ID for identity verification. The ID can be the last 4 of the social security number, a Utah driver's license number, or number from another Utah State ID. For voters who do not have one of those types of IDs, the state legislature should require the voter to enclose a photocopy of their ID with their ballot.[33] If a voter does not want to provide the last four of his social security number, a Utah driver's license number, a number from another Utah State ID, or a photocopy of their out of state photo ID with their mail-in ballot, they have the option to vote in person.

- ***Require two-factor authentication for mail-in ballots.***

As discussed above, the use of signatures to verify an individual's identity is an unreliable and unsecure method of verifying an individual's identity. Signature verification is not used to verify an individual's identity for secure applications such as on-line banking, credit card access, or automated bill payment and payroll processes. Many of these entities use two-factor identification to verify an individual's identity. If Utah is going to continue with universal mail ballots, one option to verify a voter's identity is two-factor authentication as a replacement for signature verification.[34] A two-factor identification system could, if designed correctly, be a more reliable method to verify identity than the combination of signature verification and objective ID described above.[35]

There is flexibility in how exactly to set this up to allow mail voters to confirm their votes and protect the anonymity of their votes. If the state legislature chooses this route, Utah has the tech talent necessary to set up a home grown system. A two-factor authentication system will prevent an individual from voting another person's mail ballot. It also removes the discretion that clerks offices have to verify a signature to confirm an individual's identity and could be designed

---

[33] The state legislature also should prohibit voters from using driver's licenses from states that allow illegal aliens to get driver's licenses (e.g., California, New York., Illinois, etc.). Voters with photo IDs from those states should be required to use another form of ID because the state that gave them a license grants the exact same driver's license to illegal aliens.

[34] Here is one way to set up two-factor authentication for voting: (1) a voter will be required to download an app developed by Utah for voting and set up a voter registration account (VRA) using his or her Utah driver's license; (2) the voter's mail ballot will be connected to his or her VRA; (3) the ballot that is mailed to each voter is unique to the individual voter and linked to his VRA; (3) the ballot is filled in and returned either via USPS or deposited in a drop box; (4) when the Clerk's office receives and scans the voter's ballot, it will show up in the VRA and ask the voter to confirm that the ballot belongs to him or her; (5) once the voter confirms his ballot, the ballot will be counted. In this system, if the voter fails to confirm the ballot by a deadline set by the state legislature, then the vote will not count.

[35] Of course, even two-factor authentication is not as reliable for verifying identity as requiring people to show up in person and show a photo ID to verify identity.

to remove the need to adjudicate ballots. A system like this will take time to set up and validate, which means it is not a solution that can be ready for the 2022 election cycle. If the state legislature chooses this route, it will need to be a long term solution.

The Committee is not making this its primary recommendation due to the development lift needed to set up a system like this and the impracticality of setting up a system like this in time for the 2022 election cycle.

### *What can voters do?*

- Be very particular about how you sign your voter registration form and your driver's license application (if you register to vote when you get or renew your driver's license). The more unique your signature is, the more difficult it is for a third party to submit a signature that will match your signature.

### 3.  *Voter Records - Non-Public*

***Background:*** In Utah, voter records are either public, private, or withheld.[36] Any voter can request that their voter registration information be classified as "private."[37] This means that the record will be withheld from all persons other than government entities, political parties, candidates for public office, and their contractors, employees, and volunteers . . . .[38] In contrast, a "withheld" voter record can only be disclosed to a government official.[39] People who fall into the following categories can request to have their voter records withheld:

- a victim or likely victim of domestic or dating abuse and anyone they live with;
- a law enforcement officer;
- a member of the armed forces;
- a public figure;
- an individual protected by a protective order.[40]

In addition, every voter who was classified as "private" before May 12, 2020, was re-classified as "withheld."[41] According to the Clerk, these are the voter registration numbers for Salt Lake County on November 3, 2020:

- Public: 404,219
- Private: 95,663

---

[36] The Utah Election Code does not have a category for voter registrations called "public." This term is used in this report to describe voter records that are available to the general public because they are not classified as either "private" or "withheld."

[37] *See* Utah Code Annotated § 20A-2-104(4)(ii).

[38] Utah Code Annotated § 20A-2-108(2)(b).

[39] Utah Code Annotated § 20A-2-104(4)(a)(1).

[40] Utah Code Annotated § 20A-2-104(7)(a)(i) & (ii).

[41] Utah Code Annotated § 20A-2-104(7)(b).

- Withheld: 110,339.[42]

When asked how many voters were "private" before May 12, 2020, and re-classified as "withheld", the Clerk's office responded that "[t]here is not a way to determine how many voters became withheld under 20A-2-104(7)(b)."[43] It is unclear why the state legislature reclassified these voter records. It seems the voters classified as "private" before May 12, 2020, are getting rights to which they are not entitled. Due to the change in status, no one except government officials can ever see or evaluate these records.

In addition, there were 95,663 voters classified as "private" on November 3, 2020.[44] This means that between May 12, 2020 (when all existing "private" voter records were converted to "withheld" voter records) and November 3, 2020, 95,663 voters requested to be classified as "private." This number alone seems extremely high considering that, on November 3, 2020, there were a total of 610,221 registered voters in Salt Lake County. This means 15.6% of the voters in Salt Lake County requested their records be classified as "private" over a 6-month period. As discussed above, private records are not available to the general public.

The committee filed a GRAMA request for a list of registered voters on November 3, 2020. On August 2, 2021, the committee received a copy of the list of registered voters in Salt Lake County.[45] The data file is titled "A list of registered voters on November 3, 2020 (General Election Day). This is the same list that any member of the public can request (*i.e.*, it excludes voters classified as "private" or "withheld") for a fee of $350.[46] These voter rolls only contain the records for 342,412 voters, which is 61,807 fewer public voter records than the Clerk said existed on November 3, 2020 (404,219).[47]

When the committee inquired about the discrepancy in the number of public voter records, the Clerk's office stated that the voter records were "captured from the current voter list. Therefore, anyone who has since died, moved, or otherwise been inactivated since November would be excluded from these results, as this list only includes our current active registered voters."[48] In a separate message, the Clerk's office stated that they "do not have any voter registration rolls from the past. The voter registration database is updated multiple times daily and we cannot produce any information from the past."[49] The large drop in the number of public voter records

---

[42] Exhibit A. The Salt Lake County Clerk's Office did not provide any data or documents showing how they came up with the numbers provided.

[43] Exhibit B at 1.

[44] Exhibit A.

[45] Exhibit F at 1; Exhibit G.

[46] The committee requested a fee waiver for its GRAMA request seeking a copy of the voter rolls because the request, when combined with the Committee's purpose, "primarily benefits the public rather than a person." 63G-2-203(4)(a). On August 16, 2021, the Clerk denied our appeal and stated that the voter rolls cost $350 "regardless of intended purpose." Exhibit U at 1. This appears to be a violation of Utah's GRAMA laws which require the Clerk to waive fees and charge different fees depending on the intended purpose of the GRAMA request. *See* Utah Code Annotated § 63G-2-203.

[47] Exhibit G.

[48] Exhibit B at 3.

[49] Exhibit B at 1.

(404,219-342,412=61,807) between November 3, 2020, and August 2, 2021, is surprising. Putting aside the large fluctuations in the voter rolls, from a practical perspective, the general public is only able to see a fraction of active registered voters (in this case, the Clerk's office provided only 63% of the voter records for Salt Lake County[50]). While those who are politically connected (candidates, political parties, and government officials) are able to obtain a copy of the voter roll that includes "private" records, they are not able to obtain "withheld" voter information.[51] Voters are essentially expected to trust that clerks offices and other government officials are keeping the voter rolls current, and there is no way to verify their work independently. Voters need to have a way to be able to verify independently that the clerks offices are keeping the voter rolls current.

It also is problematic that the Clerk is only able to provide a current copy of the voter registration list and is unable to provide a copy of the voter registration list from Election Day (in this case, November 3, 2020) or any of the other milestone dates during an election (*e.g.*, voter registration deadline and canvass date). This alone makes it impossible for anyone to audit an election in Salt Lake County.

***The committee has the following suggestions for reforms for the Salt Lake County Clerk's office, the state legislature, and the lieutenant governor's office:***

- The County Clerk should make a copy of the voter registration rolls on the following days: (1) the last day to register to vote before an election; (2) election day; and (3) last canvass day.

- The state legislature should consider repealing Utah Code Annotated § 20A-2-104(7)(b). It appears there was little to no justification to reclassify "private" records as "withheld." The voters whose voter registration records were changed from "private" to "withheld" are getting protections to which they are not entitled. As part of the repeal, records that were converted according to Utah Code Annotated § 20A-2-104(7)(b) should be reverted to "private" records. If records cannot be reverted automatically, then clerks offices should be required to evaluate all voters who are classified as "withheld" to determine who is actually entitled to the status because they meet one of the categories listed in Utah Code Annotated § 20A-2-104(7)(a)(i) & (ii).

- The lieutenant governor's office should work with the county clerks, to create a static file for each election date, and post it online. It should contain all the voter registration data, except names and addresses should be blanked out (not provided). ALL the records should be provided, including Private and Withheld record-types with the personal data redacted. It should be available to the public. This static data file would allow third-party

---

[50] 63% is the result of the following calculation. First, the number of public voter records dropped by 61,807, which means the new total number of voter records would be 548,414 (this is the result of subtracting 61,807 from 610,221). We took the number of public voter records the Clerk provided (342,412), divided it by the new total number of voter records (548,414), and multiplied by 100 to get the percentage of voter records provided to the committee.

[51] Going by the numbers of public, private, and withheld voter records the Clerk said existed on November 3, 2020, a political entity would have been able to see 82% of the voter records.

groups and citizens to download it and conduct limited, independent audits without submitting a GRAMA request and without inconveniencing clerks office employees. It is, afterall, public data, much like the census data is available online to anyone who wants to download it, even from our state's own Utah Geospatial Resource Center (see https://gis.utah.gov/data/address/census-luca-2020/). Census data can be obtained in groups as small as "Census Blocks", which are tiny areas as compared to Precinct areas. So there is no need for the State to hide Precinct identification in the voter-registration data.

- However, this still leaves the problem of how to audit the "withheld" voters to ensure that those records are being kept current and that only voter records of those who are actually eligible are being classified as "withheld." This committee has two potential recommendations to deal with this issue:

  ○ 1. Open up that information to the major political parties so they and their members can police the records of "withheld" voters to ensure that only records of those who are actually eligible, under Utah Code Annotated § 20A-2-104(7)(a)(i) & (ii), are being classified as "withheld." The parties can sign nondisclosure agreements regarding information about "withheld" voters.

  ○ 2. Require the county auditor or another independent auditor to conduct a bi-annual audit of "withheld" voter records in odd numbered years.

***The committee has the following suggestions for reforms for the political parties:***

- Under Utah Code Annotated § 20A-3a-804, an individual can challenge the eligibility of a voter up to 45 days before an election. This means that the parties have an incentive to periodically evaluate the voter rolls to ensure that they are accurate and to challenge the eligibility of voters who are dead, have moved[52], are incarcerated, etc. The political parties can set up committees to evaluate the Salt Lake County voter rolls and challenge ineligible voters to help the Clerk's office keep the vote rolls for Salt Lake County up to date and clean.

***What can voters do?***

- Currently, the Salt Lake County Clerk will only produce the public voter records. They will not produce the Private and Withheld records. A best practice is to produce all of the

---

[52] Most voters do not contact their county clerks to deactivate their voter registrations when they move out of a county. To deal with this problem, states developed the Electronic Registration Information Center (ERIC). ERIC's membership includes 31 states and Washington, D.C. Notably, it does not include some large blue states with major voter integrity issues like California, New York, and New Jersey. Utah is able to get reports about who has moved out of state, moved within the state, has duplicate voter registrations, or has died. The Salt Lake County Clerk uses this database to update the voter rolls when registered voters move out of state. However, this will not capture all moves out of Utah because 19 states do not participate in ERIC. In addition, any date provided by ERIC is only as good as the data provided to ERIC by its members. The quality of the voter registration data provided to ERIC by its members is unclear.

records, but delete the personal data of Private and Withheld voters and indicate that the data was redacted because the voter record is Private or Withheld. Voters can help the county clerks and Lt. Governor's office change how they produce voter record data by demanding that every voter record be produced, even if data in the record needs to be redacted to protect privacy.

### 4. Vote Counting and Processing

Our electoral process is an advocacy system, and it works best when people from all sides (the Clerk's office, the parties, and nonprofits) are involved in the election process. Observers from every major party should be encouraged to observe election processes so they can assure themselves that elections are conducted in a fair and transparent manner.

In Utah, the earliest a clerk's office can mail ballots to voters is 21 days before an election.[53] The latest a ballot can be mailed to a voter is 7 days before election day.[54] Clerk's offices can start processing ballots as soon as they have conducted logic and accuracy testing on their automatic tabulation equipment, voting devices, and voting machines.[55] Typically, counting will start 15 to 16 days before an election. Many times, counting of ballots will go well past election day. For example, in Salt Lake County, counting for the 2020 General Election continued until November 17, 2020. The result is that the Clerk's office could count ballots periodically for a month.

It is difficult, if not impossible, for citizens with full-time jobs and family obligations to observe protracted ballot processing.

***The committee has the following suggested reforms for the state legislature:***

Ideally, ballot processing should begin a day or two prior to election day and end within 24 hours after the polls have closed. Processing ballots over a shorter period of time means that more people can be involved and there is less of an opportunity for malactors to find ways to commit fraud.

- For activities before election day, the state legislature should limit the days and hours when ballots can be processed and tabulated. One suggestion would be to only allow Clerks Offices to process and tabulate ballots on weekends between 8 a.m. and 5 p.m. until Election Day. This would dramatically increase the number of people who could be involved in ballot processing and tabulation, both as poll watchers and poll workers (*e.g.*, the Clerk will be able to hire people to be poll workers who have jobs during the traditional workweek), and result in a marked improvement in the integrity of our election system. This may require that county clerks pay overtime to County employees which

---

[53] Utah Code Annotated § 20A-3a-202(2)(a).
[54] *Id*.
[55] Utah Code Annotated § 20A-5-802(1)(b).

may increase the cost of conducting an election. Extra costs can be justified if more citizens can be involved in the process.

- If the state legislature declines to set hours when clerks offices can engage in various activities before election day, it should require clerks offices to post the dates and times when they will engage in various ballot processing activities (tearing off tabs, signature verification, tabulation, adjudication, duplication, etc.) at least two weeks before they will begin ballot processing.  This way parties, groups, and citizens can plan ahead about what parts of ballot processing they can participate in.

- For activities on election day and after, the state legislature should require Clerks offices to post the dates and times when they will engage in various ballot processing activities (tearing off tabs, signature verification, tabulation, adjudication, duplication, etc.) at least two weeks before they will begin ballot processing. This will allow parties, groups, and citizens to plan ahead and make time in their schedules to participate in at least some of the ballot processing activities.

- The state legislature also should require that all ballots received by 8 p.m. on election day be processed and counted within 2 days of election day. This should cover the vast majority of mail ballots submitted for any election. This abbreviated counting period will ensure that the maximum number of citizens can participate in the vote counting process and reduce opportunities for fraud.

***The committee has the following suggestions for reforms for the political parties:***

- The political parties need to put in place poll watching programs ahead of time and ask delegates and members of the respective parties to set aside time to be involved in every aspect of collecting, processing, and tabulating votes. Members of both political parties should be present whenever the Clerk's office has its hands on any ballots. Part of this process is working with the Clerk's office ahead of time to figure out when they will take various actions so the parties can have volunteers in place to conduct poll watching and train poll watchers about what they should be looking for and how they should record any issues that they witness.

- The political parties also should encourage members to become poll workers during elections because this is another method to ensure election integrity.

***Recommendation to voters:***

- Call or email your political party and volunteer to poll watch. You can make a difference by getting involved and helping to ensure that a member of your party is always present when the Clerk's office is processing or handling ballots.

- Elect a Salt Lake County Clerk who will voluntarily limit the days and hours when balloting processing occurs and who will inform the public ahead of time about when these activities will occur so the public has the ability to fully participate in poll watching.

### 5. Ballot Deadline

Per Utah Code Annotated § 20A-3a-204(2)(a), if a ballot has a postmark of election day or before, it has to arrive before noon on the day of the official canvass following the election. The canvass is required to happen "no sooner than seven days after the election and no later than 14 days after the election."[56] In Salt Lake County, the board of canvassers typically meets to canvass the election returns 14 days after the election.[57]  This means that a voter who mails a ballot effectively has an additional 14 days to submit their ballot compared to those who vote in person or submit their ballots in a ballot drop box.

This extended deadline opens the doors to potential fraud because it depends on organizations outside of the clerks offices to ensure that deadlines are met. For example, it assumes that workers at the USPS will not backdate ballots that are submitted to the USPS after election day.[58] In addition, organizations with postage meters can change the date on the labels they print and the USPS does not stamp this type of mail with a second postmark.[59] Moreover, this extended deadline raises equal protection concerns because the deadline is 2 weeks longer for voters who mail in their ballots than for voters who vote in person or submit their ballots into a ballot drop box. It is unclear why any ballot mailed from within Utah needs 14 days to arrive at the appropriate clerk's office, or why any ballot mailed from within the United States needs more than 3 days to arrive at the appropriate clerk's office.

Ideally, the Clerk's office should be able to say exactly how many ballots it has in its possession before the workers go home on election night. This would define the universe of ballots and reduce the possibility of fraud. This cannot happen with the current system because potentially thousands of ballots could arrive after election night (in the 2020 General Election, more than 212,000 completed ballots were mailed to the Clerk's office). As discussed above, allowing ballots that have been mailed to arrive up to 14 days after the election opens up the system to additional sources of fraud. Voters in Utah can vote in person or drop their ballots into drop boxes which means there is no need for this extended period to submit mail-in ballots. For overseas voters (e.g., military members stationed or deployed overseas or individuals on missions) and voters who are temporarily in other states, we recommend continuing with the current system. After the change suggested for voters in Utah, there will be far fewer ballots arriving after election day which will make those ballots easier to track and reduce the potential for fraud.

### Suggestion for reforms for the State Legislature:

---

[56] Utah Code Annotated § 20A-4-301(1)(b).
[57] See https://slco.org/clerk/elections/dates-and-deadlines/
[58] In the 2020 General Election, there were allegations that post offices in various states ordered their employees to backdate ballots to election day. E.g., https://townhall.com/tipsheet/bethbaumann/2020/11/06/watch-another-usps-worker-says-postmasters-are-actively-backdating-ballots-n2579645.
[59] See https://faq.usps.com/s/article/What-is-a-Postage-meter.

- Make the deadline for all ballots submitted by voters from within Utah the same. Mail-in ballots should have to arrive at the Clerk's office at the same time that the polls close for in-person voting to ensure that all voters are treated the same. This is not an undue burden because voters in Utah have many options to vote in a timely manner: (1) voting in person; (2) submitting their mail ballot into a drop box; and (3) mailing the ballot from within the county that the voter resides to ensure that it arrives on time.

### 6. Ballots Without a Postmark

Per Utah Code Annotated § 20A-3a-204(2)(a), if a ballot has a postmark of election day or before or is "otherwise clearly marked by the post office as received by the post office before election day," it has to arrive before noon on the day of the official canvass following the election. Of note, it is unclear how else a ballot could be marked as received by the post office on or before election day besides a postmark. This provision appears to provide discretion to clerks offices to decide whether to accept mail ballots that arrive through the postal service after 8 p.m. on election day and do not have a postmark from election day or before.

***The committee has the following suggested reform for the state legislature:***

- Repeal the provision in Utah Code Annotated § 20A-3a-204(2)(a) allowing something other than a postmark to indicate when a ballot was mailed. This provides unnecessary discretion to clerks offices to accept mail-in ballots when voters within Utah have plenty of methods to ensure that their votes get to the Clerk's office by 8 p.m. on Election Day (by placing the ballot in a drop box, mailing it ahead of time, or voting in person).

### 7. Ballot Adjudication

Ballot adjudication is only an issue with mail-in paper ballots that have been filled in by hand (*i.e.,* this is not an issue for in-person voting in Salt Lake County which occurs on electronic voting machines). In Salt Lake County, paper ballots are scanned so they can be tabulated. If there are unclear marks for one or more of the races, the voting software will designate the ballot as needing adjudication. Examples of unclear marks are:

- marking outside the oval;
- marking more ovals than allowed for a race;
- failing to mark an oval for a race;
- using a red pen;
- drawing pictures on the ballot; and
- writing a check mark in the oval.

When one or more races on a ballot are designated as requiring adjudication, the Clerk's office has teams of two evaluate the races needing adjudication to determine how the voter intended

to vote.[60] Every time the Clerk's office employees make the wrong decision, they rob a vote from a voter.

The Salt Lake County Clerk's Office did not track the number of ballots it adjudicated in the 2018 or 2020 general elections.[61] During a tour of ballot processing during the 2021 Primary Election, one of the Clerk's employees said that typically 3-8 ballots were adjudicated per batch in the 2020 General Election. There were 150 ballots per batch in the 2020 General Election. The Clerk's Office counted 498,471 paper ballots in the 2020 General Election. This means there were 3,323 batches of ballots and that between 9,969 and 26,584 ballots were adjudicated.[62]

An additional issue is that the Clerk did not track the number of ballots that were adjudicated per race. In many cases, not every race on a ballot is adjudicated. Thus, the ballot adjudication information is only helpful if it is broken down by race. Unfortunately, we will never know the exact number of ballots that were adjudicated per race in past elections due to the Clerk's failure to track this information. The number of ballots that were adjudicated per race is important because many races in Salt Lake County are close. For example, Councilmember Laurie Stringham won her race by 1,189 votes.[63] Another example is State House of Representatives District #39 where the winner and loser were separated by 84 votes.[64] If the number of adjudicated ballots could change the outcome of a race (e.g., 595 adjudicated ballots in Laurie Stringham's race or 42 ballots in District #39), one or both of the candidates may want to review the adjudicated ballots to determine if they want to challenge the results.

In an ideal world, the Clerk's office would not adjudicate ballots. This, unfortunately, happens because we have a system where a ballot is tabulated after it is separated from the envelope identifying the voter. This is done to protect the secrecy of the vote. The question is how to improve this process so that voters and candidates know why ballots were adjudicated and how many were adjudicated per race.

***The committee has the following suggested reforms for the state legislature:***

- We recommend that the state legislature pass a law requiring clerks offices to keep an electronic log of adjudicated ballots that includes the ballot type, the control number, which races were adjudicated, who adjudicated the ballot, and the reason for

---

[60] The information about the process for ballot adjudication is from discussions the Committee had with employees of the Clerk's office during a tour of the Clerk's facilities in August 2021.

[61] Exhibit H at 1 (In response to a GRAMA request for the number of ballots adjudicated in the 2018 and 2020 elections, the Clerk's office responded that they "do not maintain a record of the number of ballots adjudicated in the 2018 of the 2020 elections.").

[62] In response to a GRAMA request, the Clerk's office provided an email conversation where Stephen Moore told Lannie Chapman, on November 2, 2020, at 3:46 p.m., that they had tabulated 240,961 and "[o]ut of those, 2,816 are waiting to be adjudicated." The Committee did not use this number to calculate the potential number of adjudicated ballots in the 2020 General Election because it is unclear if this means they had to adjudicate a total of 2,816 ballots out of those ballots, or that is the number left to adjudicate at that date and time. Exhibit I at 3.

[63] See https://results.enr.clarityelections.com/UT/Salt_Lake/107137/Web02.264677/#/.

[64] *Id*

adjudication.[65] After the canvas period is complete, the clerks offices should be required to post a copy of their log onto their website with a list of reasons for adjudication. This will allow voters to learn why ballots were adjudicated so they can prevent this from happening to their own vote.

- Currently, the Clerk's office keeps adjudicated ballots with their original batch of ballots. Each batch of votes is put into an individual box and sealed. As discussed above, there were 3,323 batches of ballots. This means there should be 3,323 sealed boxes with ballots from the 2020 General Election, each of which contains 3-8 adjudicated ballots. Because the adjudicated ballots are dispersed, accessing them to conduct an audit of the paper adjudicated ballots is labor intensive and time consuming. We recommend that adjudicated ballots be segregated and kept separately from ballots that do not require adjudication. This will make it easier to audit adjudicated ballots in close races.

### *Recommendations for voters:*

- Ballot adjudication only happens with mail-in paper ballots. If you are unsure about your ability to properly fill out a ballot to ensure it is counted as your desire, you should vote in person in a voting center.

- Elect a Salt Lake County Clerk who will voluntarily implement improved tracking of adjudicated ballots.

### *8.  Electronic Log of Duplicated Ballots*

The Clerk's office duplicates ballots for many reasons, including when a ballot is physically damaged (*e.g.*, ripped in half by one of the machines that processes ballots[66], torn, damaged by liquid, etc.) or is a ballot printed on regular paper (these are typically ballots from military members deployed overseas). If the Clerk's office duplicates a ballot, it has to duplicate the entire ballot. It is important to track ballot duplication because a Clerk's office employee could either purposefully or inadvertently flip votes while duplicating a ballot. On July 1, 2021, in response to a GRAMA request, the Clerk's office produced its logs of duplicated ballots in the 2020 Primary and General Elections.[67] The logs are handwritten, which makes them difficult to sort, and many of the pages have water damage that makes them indecipherable. Members of the committee spent hours taking the handwritten data provided by the Clerk's office and putting

---

[65] The spreadsheet or other electronic method used to track the reasons for ballot adjudication should provide a dropdown with options to show why ballots were adjudicated. Some of the options could be red pen, photo drawn on ballot, checkmark, etc. "Unknown" should not be an option. "Other" can be an option but should require the individual filling in the space to provide further explanation about why it is being adjudicated. This will standardize the justifications for adjudicating ballots and make it easier for individuals and organizations outside of the Clerk's office to understand why ballots were adjudicated.

[66] During a tour of the Salt Lake County Clerk's ballot processing facility during the 2021 primary election, the committee witnessed the machine that is used to open envelopes (after the signature has been verified) tear a ballot in half when the machine opened the envelope. Once that happens, the ballot will need to be duplicated before it can be scanned into the tabulator.

[67] Exhibit R.

them into spreadsheets.[68] They found that 5,581 ballots were duplicated in the 2020 General Election.[69] There were multiple reasons given for duplicating ballots (*e.g.*, MOS, PDF, military, water, and cut). Due to the closeness of many races in Salt Lake County, it is important to track the number of ballots that were duplicated per precinct. That data should be in a form that can be easily searched by candidates and citizens so they can figure out how many ballots were duplicated in particular races and determine if it is worth auditing the duplicated ballots.

***The committee recommends the following reform to the State Legislature:***

- We recommend that the state legislature pass a law requiring clerks offices to keep an electronic log of duplicated ballots that includes the ballot type, the control number, who duplicated the ballot, and the reason for duplication. After the canvas period is complete, the clerks offices should be required to post a copy of their log onto their website with a list of reasons for duplication. This will allow voters to learn about what causes ballots to be duplicated so that voters can prevent this from happening to their own vote. As discussed in more detail below, county clerks, without any action from the state legislature, can and should voluntarily implement this proposal.

***Recommendations for voters:***

- Ballot duplication only happens with paper ballots. If you are unsure about whether your ballot will get through ballot processing without being damaged, you should vote in person in a voting center if you are able.

- This issue of properly tracking ballot duplication can be fixed by the Salt Lake County Clerk. The current problem is that the Clerk's office is handwriting ballot duplication information on paper, does not have standard categorizations for why they are duplicating ballots, and far too many of the entries say that the reason the ballot was duplicated is "unknown."

### 9. *Ballot Harvesting*

Ballot harvesting is when individuals or groups collect ballots from voters and (hopefully) turn them into the Clerk's office for voters without altering the ballots. There are different types of ballot harvesting. For example, in states where ballot harvesting is legal, politically-aligned nonprofits and unions pay people to: (1) go door to door and collect ballots from voters[70]; (2) go to locations where there are lots of vulnerable individuals like nursing homes to "help" the residents vote and collect their ballots[71]; (3) pick up ballots that are mailed to wrong addresses

---

[68] Exhibit S.

[69] *See id.*

[70] In California, left-leaning groups (*e.g.*, public sector unions) pay people to go door to door and collect ballots in California. https://pjmedia.com/election/rick-moran/2020/10/20/democrat-ballot-harvesting-in-california-backfiring-spectacularly-n1072749.

[71] See https://www.maciverinstitute.com/2020/11/want-to-find-vote-fraud-look-no-further-than-nursing-homes/ (examples of ballot harvesters taking advantage of nursing home residents in multiple states where ballot harvesting is illegal).

or to people that no longer exist. There are examples of people stealing ballots from mailboxes.[72]

In Utah Code Annotated § 20A-3a-501(5)(a), Utah banned ballot harvesting. Although Utah has a ban on ballot harvesting, members of a household are allowed to turn in ballots for other members of their household and for certain individuals who are disabled, illiterate, or blind.[73] There are no limits on how many voters one individual can assist under Utah Code Annotated § 20A-3a-208.

Ballot harvesting could be occurring in Utah particularly given difficulties verifying the identity of voters using signature matching. We were unable to identify any enforcement measures that were deployed in Salt Lake County to prevent ballot harvesting. The most effective way to prevent this practice is to understand how ballot harvesters operate and improve our voting system to thwart them. One tool the ballot harvesters use are ballot drop boxes that do not have 24-hour surveillance. This means that an individual can collect multiple ballots and drop them in a drop box and there is no record that the ballot was submitted by someone other than the voter. This can be remedied by requiring that all ballot drop boxes be under 24-hour surveillance.

Clerks offices might argue that their signature verification efforts will cut out fraudulent ballots. The problem is that the bias of any clerk's office is to verify signatures rather than go through the more labor-intensive ballot curing process. They are trying to count as many ballots as quickly as possible which means the bias is in favor of verifying signatures. An objective form of voter ID, discussed above, combined with 24-hour surveillance of ballot drop boxes would help address this issue.

***The committee recommends the following reform to the State Legislature:***

- Our recommendations to require an objective form of ID[74] for ballots dropped into the mail or drop boxes and 24-hour surveillance of ballot drop boxes also will impede the ability to harvest ballots.

- We also recommend that the state legislature add a provision to the law requiring individuals, who help non-family members who are disabled, illiterate, or blind vote, to somehow indicate that they are providing assistance on the envelope used to submit the ballot to the clerks office. One possibility is to add an area where the individual providing assistance can sign and print his or her name and provide his or her contact information so the clerk's office can contact him or her if there is an issue. The purpose of this

---

[72] See, e.g., https://newspunch.com/thief-caught-on-surveillance-video-stealing-mail-in-ballots-from-mailboxes-in-san-diego/
[73] See Utah Code Annotated § 20A-3a-501(5)(a).
[74] In this context, an objective form of ID means either requiring individuals to write their ID number underneath their signature or two-factor identification, both of which are described above.

recommendation is to protect our vulnerable citizens from being taken advantage of by malactors.

### 10. Repeal Utah Code Annotated § 20A-1-308 (Elections During Declared Emergencies)

Utah Code Annotated § 20A-1-308(3) provides that during a declared emergency, "the lieutenant governor may designate a method, time, or location for, or relating to, an event described in Section (1)(b) [voting on election day, early voting, the transmittal or voting of a ballot, the counting of a ballot, or the canvassing of election returns] that is different than the method, time, or location described in this title." This allows the lieutenant governor to change election laws if the President, Governor, or Chief Executive Officer of a political subdivision declares an emergency under one of the laws identified in the statute.

This law provides too much discretion to a single individual to change election laws in ways that could impact turnout and how people choose to vote and increase the potential for election fraud. This law should be repealed. There is no need to give a single individual this type of power because elections are not held on a daily basis. They are held twice a year which means there should be adequate time for the legislature to be called into a special session to respond if there is an emergency requiring a change to the time, place, and manner of elections.

Moreover, per Art. I, Section IV, Clause I of the U.S. Constitution, state legislatures, not lieutenant governors, are supposed to determine the time, place, and manner of holding elections for Senators and Representatives. Similarly, under Article II, Section I, Clause II of the U.S. Constitution, state legislatures determine the manner to select electors for the Electoral College. The general elections in even years will always include federal elections. The state legislature should not delegate its Constitutional duty to the lieutenant governor or any other state officer. Rather, it should zealously protect its powers under the Constitution from any sort of infraction from state or federal officials.

***Suggestion for state legislature:***

- Repeal Utah Code Annotated § 20A-1-308 (Elections during declared emergencies). One individual should not be able to change voting laws for any reason. If there is an emergency, the state legislature can and should be called into an emergency or special session to make any adjustments needed to Utah's election code.

### 11. Access to Election-Related Documents

GRAMA requests are an effective tool that citizens have to force county clerks to provide information about their activities.

Unfortunately, there seems to be instances where the Salt Lake County Clerk's office might be using GRAMA fees to discourage citizens from requesting information.

County Clerks should work with GRAMA applicants to ensure free GRAMA requests for election information. This will significantly improve the transparency and integrity of our elections. For example, a citizen-led group could request a copy of all of the scanned ballot images, including adjudicated and duplicate ballots. This data does not contain any data that can be used to identify a voter. It also is electronic and should not be hard to retrieve. Allowing this information to be available for free to residents of Utah will allow citizen-led groups to reprocess the ballots and conduct limited audits. There are few disadvantages to allowing free GRAMA requests because it will help to improve our system. Moreover, we (the citizens of Utah) pay for our state and county governments with our hard-earned income.

*What can voters do?*

- File GRAMA requests requesting information from state and local governments, including your local clerk's office. When you make the request, keep the request very specific and not overly burdensome. Request a fee waiver. If appropriate, appeal if your request for a fee waiver is denied. There are specific processes for the GRAMA appeals process. Follow State and County statutes as it relates to your appeals and utilize the Office of the State Records Ombudsman. When you get a response to your GRAMA request, feel free to share it in a forum with other citizens so that information is out in the public. Someone else may see something that you did not see in the request and come up with more ideas for GRAMA requests.

### 12. Prohibit Private Funding of Elections

Two counties in Utah received grants from a foundation (Center for Tech and Civic Life) run by Facebook's founder, Mark Zuckerberg, to administer the 2020 General Election. Utah County received $241,664.50.[75] Cache County received $53,945.50.[76] Private funds should not be used for election administration because they might come with strings attached that support the agenda of the individual or group who provides the funds.

*Recommendation for State Legislature*:

- Ban subdivisions of the State of Utah from receiving and using private money for election administration.

### 13. Post-Election Evaluations

Per Utah Code Annotated § 20A-3a-202(9) (Conducting election by mail), the "lieutenant governor shall . . . develop procedures for conducting an audit of affidavit signatures on ballots case in an election under this section; (ii) for after each primary, general, or special election conducted under this section, select a number of ballots, in varying jurisdictions, to audit in accordance with the procedures developed under Subsection (9)(a)(i)." For the 2020 General

---

[75] Exhibits J through L.
[76] Exhibit M.

Election, the Lt. Gov's office put out a policy requiring each county to audit: (1) 1% or 1,000 ballots cast using ES&S equipment, and (2) 1% or 1,000 signature affidavits on ballot envelopes, whichever is less.[77] The audit under (1) is a comparison of the ballot image to how the "machine counted the ballot."[78] For this audit, Salt Lake County reviewed 1,000 signatures and 1,136 ballots. This is out of a total of 498,471 paper ballots received by that office. This audit is too limited in size and scope to be able to find any issues that may be occurring.

We need more extensive audits of our elections to prevent and root out election fraud. The Committee evaluated data from the 2020 General Election in Salt Lake County and found indications that there were between 14,000 and 32,000 excess votes that cannot, based on the data provided by the Salt Lake County Clerk, be attributed to registered voters in Salt Lake County in the 2020 General Election (a.k.a., excess votes). The exact number of excess votes depends on the data set used. As previously discussed, according to the Salt Lake County Clerk, these are the voter registration numbers for Salt Lake County for the November 3, 2020 election:

- Public: 404,219
- Private: 95,663
- Withheld: 110,339.[79]

According to the Clerk's data, in the November 3rd General Election, the total number of voters classified as private and withheld was 206,002.[80]

### a. 32,722 Excess Ballots Cast Based on Spreadsheet Showing Who Voted in the 2020 General Election

In response to a GRAMA request, the Salt Lake County Clerk provided a list of all voters who voted in the November 2020 General Election.[81] This list does not contain any voter records for voters classified as private or withheld.[82] The spreadsheet shows that on November 3, 2020, there were 404,219 registered voters whose records were not classified as private or withheld.[83] It also shows that 311,158 of those individuals voted in the November 3, 2020 General

---

[77] Exhibit N. The Lt. Gov's office only produced a policy for counties that use ES&S machines. Although Salt Lake County used Dominion Voting Systems machines to administer the 2020 General Election, it followed the Lt. Gov's ES&S Audit Policy.

[78] See Exhibit N at 3.

[79] Exhibit O. The Salt Lake County Clerk's Office did not provide any data or documents showing how they came up with the numbers provided.

[80] See Exhibit O.

[81] Exhibit P is the Election Day Voter List. Exhibit P is extremely large and not included with this report. The Committee tried to PDF the report to attach it to this report. The committee stopped the conversion to PDF from continuing at 30,000 pages. If you would like to see a copy of it, please contact the SLCo GOP.

[82] See id.

[83] Id. This number (404,219) matches the number of public voter records that the Salt Lake County Clerk said that it had on November 3, 2020.

Election.[84] According to the Clerk's office, 549,882 ballots were cast in the 2020 General Election.[85] This means that 238,724 (549,882 - 311,158 = 238,724) ballots were cast by voters classified as private or withheld. According to the Salt Lake County Clerk, there were 206,002 private and withheld voters on November 3, 2020. This means there were at least **32,722** excess votes (238,724 - 206,002 = 32,722) that cannot be attributed to any registered voters based on the spreadsheet provided by the Salt Lake County Clerk showing who voted on November 3, 2020.[86] In other words, the private and withheld voters turned out at a 116% rate.

|  | Salt Lake County |
|---|---|
| Reported County-Wide Turnout | 90.11%[87] |
| Total Reported Ballots Cast | 549,882[88] |
| Total Registered Voters | 610,218[89] |
| Total Withheld and Private Registrations | 206,002[90] |
| Ballots Cast by Voters Whose Data is Public | 311,158[91] |
| Ballots Cast by Voters Whose Data is Withheld or Private | 238,724 |
| Minimum Number of Excess Votes | 32,722 |
| Turnout by Withheld and Private Voters | 116% |

   b. ***14,336 Unexplained Excess Ballots Cast Based on Data Provided by the Salt Lake County Clerk to the SLCo GOP***

The Committee is part of the SLCo GOP. As a result, it also had access to a copy of the voter registration rolls that included records classified as private.[92] A similar analysis to that described

---

[84] *Id*. As an aside, according to this data, the turnout for voters, whose data is neither private nor withheld, was 76.9%, which is significantly less than the overall turnout of 90.11% reported by the Salt Lake County Clerk. https://results.enr.clarityelections.com/UT/Salt_Lake/107137/Web02.264677/#/

[85] https://results.enr.clarityelections.com/UT/Salt_Lake/107137/Web02.264677/#/

[86] We say "at least 32,722 excess votes" because our calculation assumes 116% turnout for private and withheld voters which is statistically unlikely if not impossible. If the actual turnout among those voter categories was lower, then the number of excess votes will be higher.

[87] https://results.enr.clarityelections.com/UT/Salt_Lake/107137/Web02.264677/#/

[88] *Id*.

[89] *Id*

[90] Exhibit O.

[91] Exhibit P.

[92] The SLCo GOP has the legal authority to look at a voter registration list with "private" voter records. The general public, however, cannot see voter registration records that are classified as private. Thus, the Committee cannot release the voter registration rolls used in this calculation to the public.

above resulted in **14,336** unexplained excess ballots cast using this set of data. This equates to an impossible 117% turnout for the estimated number of withheld registrations.

These discrepancies are large enough to affect the outcome of election contests. It is difficult for candidates and voters to have confidence in election results with such discrepancies.  Reform is needed.

The Salt Lake County Clerk provided data that shows excess votes and, depending on the data set used, is not consistent. The data provided to the Committee and the SLCo GOP by the Salt Lake County Clerk's Office showing excess votes demonstrates the need for a comprehensive post-election evaluation.[93] The data from a post-election evaluation can be used to make improvements to the voting system and make recommendations for new laws the state legislature can pass to address any vulnerabilities identified by the audit. The clerks offices also could release information from the post-election evaluation to help voters protect their vote. For example, if they saw indications of fraud at nursing homes (*e.g.*, all the signatures from the nursing home were written in a similar style), they could put out an alert so families know that they should go and help their family members in nursing homes vote.

***The committee recommends the following reform to the State Legislature:***

- Require that clerks offices conduct a comprehensive post-election evaluation after every election. The evaluation should be required to include an inspection of the full registered voter database for the county (including voters classified as "private" or "withheld"), a hand recount of all paper ballots that includes a verification that each ballot is on the correct type of paper, an evaluation of any machines used to verify signatures or tabulate ballots, an evaluation of any routers that directed internet traffic to or from the signature verification machines or tabulators, an independent review of all ballots that were adjudicated and duplicated, and a canvas to determine if any voters are registered to warehouses, office buildings, or empty lots, and if there are too many voters registered at a home or apartment building. The final evaluation report and all underlying data should be posted to the websites of clerks offices for public consumption.

- Allow 3rd parties to conduct full forensic audits at their own expense.

- The Committee has not identified any laws blocking a comprehensive post-election evaluation. However, it is inevitable that independent groups will file lawsuits if a clerk initiates an audit. If a court finds that a particular law prevents clerks from doing an audit, the state legislature should repeal the law so the audit can proceed.

***Recommendation for the Salt Lake County Council:***

- Provide the funding necessary for the Clerk's office to conduct a full forensic audit after every election.

---

[93] There may be a plausible explanation for the data discrepancies. As discussed earlier, the Committee is not aware of any explanation by the Clerk of the data discrepancies identified above.

***What can voters do?***

- County clerks do not appear to be barred from conducting comprehensive audits of our elections and they should conduct comprehensive audits after every election.

### 14. *Ballot Images*

The mail-in paper ballots do not have any personal information of voters on them to protect the secrecy of the vote (any personal information of a voter is on the envelope used to transmit the ballot by mail or by drop box). Those ballots are scanned into Dominion tabulators by the Salt Lake County Clerk's Office. Those images, including for ballots that have been adjudicated or duplicated, should be posted online so that members of the public can freely view them. This will allow any third party to evaluate the ballots and conduct a limited audit for things like duplicate ballots.

***The committee recommends the following reform to the State Legislature:*** :

- Require that clerks offices post ballot images so that members of the public can evaluate them and conduct their own limited audits.

***What can voters do?***

- County clerks appear to be able to post ballot images online without being forced to by the state legislature and voters should elect a County Clerk who will post ballot images online after every election.

### 15. *Forensic Images*

The Salt Lake County Clerk does not keep "service records . . . for ballot reading machines or tabulator machine[s] . . . ."[94] This means that the Clerk is not tracking when vendors service the machines which could happen after the machines have gone through logic and accuracy testing[95] or when they are being used to administer an election. The issue is that there is no log of when the ballot reading machines or tabulator machines have been serviced and what type of service was done on them. As a result, the public has no way of knowing if any of those machines were serviced after logic and accuracy testing and before or during an election. The

---

[94] Exhibit Q.
[95] Before every election, the Clerk's office conducts logic and accuracy tests on any automatic tabulating equipment, voting devices, and voting machines. UT Code. 20A-5-802(1)(a); Exhibit R. The purpose is to ensure "that the voting equipment performs the voting equipment's functions accurately." Ut. Code. 20A-5-802(1)(a). Once the logic and accuracy tests are complete, the equipment that has been tested should not be altered in any way. *See id*. If the machines are serviced or altered in any way after the logic and accuracy tests and before or during the election, then the purpose of the logic and accuracy test is defeated.

public has a right to know when this voting equipment is serviced and needs to have a way to verify what type of work was done on them.[96]

***Recommendation for State Legislature***:

- Require that clerks offices keep a log of service work conducted on voting equipment that includes: date of service, time of service, the names of the Clerk's employees who watched as the service was done, the names of the individuals from the vendor doing the service work, and a description of what type of service was done.

- Require that clerk's offices take forensic images of all voting equipment (automatic tabulating equipment, voting devices, voting machines, the signature verification machines, routers, and any other computer equipment): (1) before and after every service call that will change the software configuration of the machine; (2) when logic and accuracy testing is complete; and (3) after the results are tabulated for the canvass.

***What can voters do?***

- County clerks can make taking ballot images part of their normal processes and procedures and voters can elect a County Clerk who will take ballot images of voting equipment and the appropriate times.

### 16. Black Boxes

Salt Lake County uses a machine manufactured and serviced by Runbeck to conduct signature verification and Dominion Voting Systems to provide electronic voting booths, scanners, tabulators, workstations, different types of software, and services necessary to administer an election with their systems. These are powerful computers with complicated software that cannot be audited by normal citizens. They require people with special skills and certifications to work on them and audit them. The downside of making voting systems more complicated is that normal citizens have less of any ability to audit election results. This means that citizens are increasingly expected to trust that elected officials and bureaucrats are properly administering elections without any ability to verify their work.

Salt Lake County, let alone the State of Utah, simply does not have the resources to staff and fund a computerized vote capture and tabulation system that will be as secure as a small to medium sized regional bank. A computerized voting system, such as the one employed by Salt Lake County, has many similarities with a bank computer system. Both systems handle large amounts of valuable data. A ballot is worth at least as much as currency. A bank system handles 10's of 1000's or 100's of thousands of transactions per day for approximately 260 business days per year. The banking industry employs 1000's of IT professionals and spends

---

[96] On November 2, 2021, Committee members and GOP volunteers poll watched at the Salt Lake County Clerk's ballot center from 8:00 a.m. until about 9:30 p.m. During that time, a Runbeck tech had to service both of the Clerk's Agilis machines. The Committee has filed a GRAMA request for what exactly was fixed by the tech on each machine.

billions of dollars maintaining their systems so they have zero errors and are ultra secure. A voting system for an individual state will handle a volume of votes that is similar to a bank's daily volume but will only handle that volume a few days per year. Salt Lake County's voting system should be maintained to the same standards of security and accuracy as any financial institution.

***The committee recommends the following reform to the State Legislature:***

- Pass laws requiring that ballots be counted by hand or at least that counties that use machines have to also conduct a certain hand count of paper ballots and release both the machine and hand count results. Utah needs to get back to the basics when it comes to voting systems to ensure that normal citizens can audit the work of our county clerks.

### Conclusion

Election systems are complicated and need regular scrutiny and improvements. One can argue that the office of the County Clerk is one of the most important elected positions in our Counties, and across our State and Nation.

Our report is not intended as an attack on any elected official or its staff, but our research and its findings clearly show there is much need for objective review and improved policies.

As previously stated, this report was reviewed by several State Legislators during the 2022 Legislative Session. However, we have not completed a deep dive into the bills that were passed regarding election issues.

We hope you have enjoyed our Report and that you have a renewed commitment to participate in the election process. We also hope it has been helpful and that you have a better understanding of the critical role of our County Clerks.

Sincerely,

Election Integrity Committee

 Gmail

Goud Maragani <goud.p.maragani@gmail.com>

---

## Records Request Response

**Michelle Blue** <MBlue@slco.org>                                    Mon, Aug 16, 2021 at 10:12 AM
To: Goud Maragani <goud.p.maragani@gmail.com>
Cc: ███████████████████████

Hello Goud,

Here is the breakdown of active voters by privacy status on November 3, 2020:

Private: 95,663

Withheld: 110,339

Not Private/Withheld: 404,219

All active voters: 610,221

As you can see, nearly 34% of voters would be excluded from the list.

Also, please remember this data is captured from our current voter list.  Therefore, anyone who has since died, moved, or otherwise been inactivated since November would be excluded from these results, as this list only includes our current active registered voters.  That would account for the rest of the voters who are not on your list.

Please let me know if you have any additional questions.

Best,



**Michelle Blue**

Administration/Finance Manager

Salt Lake County Clerk

MBlue@slco.org

385-468-7425

  SLCo Clerk Website

Exhibit E, page 1 of 2

**From:** Goud Maragani <goud.p.maragani@gmail.com>
**Sent:** Sunday, August 15, 2021 10:11 PM
**To:** Michelle Blue <MBlue@slco.org>

[Quoted text hidden]

[Quoted text hidden]